## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

SARA HAIDEE ALEMAN MEDRANO
P.O. Box 3165
Frederick, MD 21705-3165
Frederick County

     and

RESOURCES FOR IMMIGRANT SUPPORT AND
EMPOWERMENT COALITION OF WESTERN
MARYLAND on behalf of itself and its members,
P.O. Box 3165
Frederick, MD 21705-3165
Frederick County

     Plaintiffs,

v.

Frederick County Sheriff CHARLES A. JENKINS
in his official and individual capacities
Frederick County Law Enforcement Center
110 Airport Drive East
Frederick, MD 21701
Frederick County

     and

Frederick County Deputy Sheriff
BRIAN M. MOTHERSHEAD
in his official and individual capacity
Frederick County Law Enforcement Center
110 Airport Drive East
Frederick, MD 21701
Frederick County

     and

Frederick County Deputy Sheriff
RANDY C. BARRERA
in his official and individual capacity
Frederick County Law Enforcement Center
110 Airport Drive East
Frederick, MD 21701
Frederick County

Civil Action No.

**<u>JURY TRIAL DEMANDED</u>**

and

FREDERICK COUNTY, MARYLAND
Serve: John Mathias, Esq.
Frederick County Attorney
12 East Church Street
Frederick, Maryland 21701
Frederick County

and

FREDERICK COUNTY SHERIFF'S OFFICE
Serve:  Sheriff Charles Jenkins
110 Airport Drive East
Frederick, MD 21701
Frederick County

Defendants.

## COMPLAINT

Plaintiffs Sara Haidee Aleman Medrano and the Resources for Immigrant Support and Empowerment Coalition of Western Maryland ("RISE Coalition") bring this action pursuant to 42 U.S.C. § 1983, seeking relief for injuries caused by the acts and/or omissions of Defendants in violation of the Fourth and Fourteenth Amendments to the United States Constitution and Title VI of the Civil Rights Act of 1964.  Frederick County is sued under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978), for the establishment and execution of its unconstitutional customs and policies.

## INTRODUCTION

1.     Frederick County Sheriff Charles Jenkins is a vocal proponent of localized immigration enforcement, and notoriously participates in immigration programs that integrate racial profiling of the Latinx community into its enforcement scheme.  Defendant Jenkins has participated in these programs for more than a decade and immigration enforcement has become

a regular policing strategy in Frederick County.  Frederick County's dual form of law enforcement treats immigrants as second class, producing fear that discourages immigrants from vindicating their rights and leaving constitutional violations unaddressed.

2.      Ms. Medrano, and other immigrant members of the RISE Coalition have been subjected to unlawful and unconstitutional interrogation, seizure and detention based solely on their race and/or ethnicity.  Ms. Medrano is a hardworking mother and grandmother, who has no criminal record and was racially profiled and unlawfully detained by the Frederick County Sheriff's Office because she is Latina.  Sheriff Jenkins and the Frederick County Sheriff's Office implement policies and practices that condone and perpetuate this discriminatory and unlawful behavior, directly resulting in the violation of Ms. Medrano's constitutional rights.

3.      The Frederick County Sheriff's Office has harassed other members of the RISE Coalition as well, targeting and questioning them for suspected immigration violations without legal authority to do so, including the targeting of Latinx U.S. citizens, who Frederick County sheriff's deputies wrongly assume have violated U.S. immigration laws.  The Defendant's anti-immigrant rhetoric has translated into a practice of anti-immigrant policing in an effort to make immigrants, in particular Latinx immigrants, feel inferior.

## PARTIES

4.      Plaintiff SARA HAIDEE ALEMAN MEDRANO ("Ms. Medrano") is a resident of Frederick County.  Ms. Medrano is a Latina woman who has lived in Frederick, Maryland for more than 13 years and whose family lives in the area as well.  Ms. Medrano's native language is Spanish, and she speaks and understands only limited English.  She is a grandmother and mother, with no criminal record nor even traffic tickets to speak of, and is a hardworking resident of

Frederick County employed at a home cleaning service.  She is a member of the Resources for Immigrant Support and Empowerment Coalition of Western Maryland.

5.      Plaintiff RESOURCES FOR IMMIGRANT SUPPORT AND EMPOWERMENT COALITION OF WESTERN MARYLAND (the "RISE Coalition") is a grassroots membership organization whose mission is to empower the immigrant community in Western Maryland by organizing existing resources and providing new resources to support the immigrant community to live productive and healthy lives free from harassment and discrimination.  The organization consists of over 150 non-United States citizen residents living primarily in Western Maryland counties, including Ms. Medrano and other Frederick County residents, as well as U.S. citizen allies who want to ensure that their immigrant neighbors are treated with dignity and respect. Some Coalition members do not live in Western Maryland, but either travel through Western Maryland counties or participate in other statewide organizations with a focus on protecting the rights of Maryland immigrants.  The organization includes members who have suffered from the Frederick County's discriminatory policing practices.  The Coalition has very few resources, and much of its membership operates on a volunteer basis.  RISE participates in this action seeking only declaratory and injunctive relief as to the illegality of Defendants' policy, custom, pattern and practice of racially discriminatory and unlawful policing.

6.      Defendant CHARLES A. JENKINS is the Sheriff of Frederick County, Maryland. Under state and municipal law, he is charged with ultimate responsibility for the training and supervision of Frederick County Sheriff's Office ("FCSO") personnel, as well as for establishing, administering, and implementing FCSO policies, practices, and/or customs.  In his capacity as Sheriff, Defendant Jenkins is the FCSO signatory of a memorandum of agreement with U.S. Immigrations and Customs Enforcement ("ICE"), which authorizes certain deputy sheriffs to carry

out limited, specified functions of federal immigration officers (the "287(g) MOA").  Defendant

Jenkins also receives federal funding through his Inter-governmental Service Agreement ("IGSA")

with ICE to hold immigrant detainees in the Frederick County jail, operated by FCSO and receives

money through the State Criminal Alien Assistance Program ("SCAAP").  Defendant Jenkins is

sued in his official and individual capacities.  During all times relevant to this Complaint,

Defendant Jenkins was acting as the chief law enforcement agent of Frederick County and is the

final decisionmaker for Frederick County in the area of law enforcement.

7.     Defendant BRIAN M. MOTHERSHEAD is a deputy sheriff of the FCSO.  He is

responsible for carrying out the policies, practices, and/or customs of the FCSO.  Defendant

Mothershead unlawfully detained Ms. Medrano on July 7, 2018.  He is sued in his official and

individual capacities.  During all times relevant to this Complaint, Defendant Mothershead was

acting as a law enforcement agent of Frederick County.

8.     Defendant RANDY C. BARRERA is a deputy sheriff of the FCSO.  He is

responsible for carrying out the policies, practices, and/or customs of the FCSO.  He also

participated in the illegal arrest of Ms. Medrano on July 7, 2018.  He is sued in his official and

individual capacities.  During all times relevant to this Complaint, Defendant Barrera was acting

as a law enforcement agent of Frederick County.

9.     Defendant FREDERICK COUNTY, MARYLAND is a political subdivision of the

State of Maryland and is the corporate name designated by the Frederick County Charter in all

actions and proceedings touching the County's rights, powers, properties, liabilities, and duties.

Frederick County transitioned from a County Commissioner form of government to a County

Charter form of government on December 1, 2014.  Defendant Frederick County, Maryland

consists of a five-member County Council and a County Executive.  The Frederick County Council

has the power to influence and control the actions of the Sheriff's Office by defunding programs that encourage racial profiling and by appropriating funds for training deputies to carry out lawful police practices.  The County Executive establishes policies and proposes the annual budget for Frederick County, which includes the budget for the FCSO.  Defendant Frederick County, Maryland receives funding from the federal government that is directly dispersed to the FCSO from the U.S. Department of Justice's SCAAP program.  The funding is approved by the County Executive and dispersed to FCSO by the County Council through the budget.  By both its actions and inaction, Defendant Frederick County, Maryland has agreed with, accepted, acquiesced in, and sanctioned Defendant Jenkins' focus on supposed enforcement of federal immigration laws at the expense of pursuit of criminal conduct and has done the same with regard to Defendant's policy and practice of employing illegal and improper racial profiling and other discriminatory treatment of Plaintiffs.

10.      Defendant FREDERICK COUNTY SHERIFF'S OFFICE is the office of the primary law enforcement agency in Frederick County, established under Maryland State law. Defendant Frederick County Sheriff's Office directly receives federal funding through the IGSA reimbursement and through SCAAP funding from the U.S. Department of Justice. It is the Office currently held by Defendant Jenkins, and is the employer of Defendants Mothershead and Barrera. As a recipient of federal funding, FCSO is legally required to provide and conduct its programs and activities in a racially and ethnically non-discriminatory manner.

## JURISDICTION AND VENUE

11.      This Court has jurisdiction over Plaintiffs' claims arising under the U.S. Constitution and federal statutes pursuant to 28 U.S.C. §§ 1331, 1343, and 1361.  Jurisdiction to grant declaratory judgment is conferred by 28 U.S.C. §§ 2201-02.

12.     Venue is proper in this district under 28 U.S.C. § 1391(b) in that a substantial part of the acts and omissions giving rise to the Plaintiffs' claims arose in this district.

## STATEMENT OF FACTS

13.     For over a decade, Frederick County Sheriff Charles Jenkins, and his Office have engaged in a pattern and practice of anti-immigrant efforts to target and ostracize the immigrant community in Frederick County.  Specifically, these actions consist of unlawful detentions during traffic stops, violations of the Fourth Amendment, harassment of immigrants based on their race and ethnicity, and unequal treatment of people suspected to have immigration issues.

14.     Defendant Jenkins' and the FCSO's discriminatory policing is motivated by racial animus toward Latinx immigrants that he has made clear through statements in the media and at public events, and advocacy for national immigration policies that are closely aligned with white nationalism. He also engages in immigration programs that allow the FCSO to collaborate with federal immigration authorities. In practice, those immigration programs target specific communities in Frederick County.

15.     Defendant Jenkins entered into the 287(g) MOA as part of the "287(g) program," in which certain officers are trained to conduct civil immigration enforcement tasks that are otherwise the exclusive responsibility and jurisdiction of federal immigration authorities.  The immigration enforcement duties under the 287(g) program officially exist only within the detention center, where deputized officers conduct immigration checks upon an arrestee's booking. However, Jenkins circumvents this limitation by requiring that everyone arrested by the FCSO be brought to the Frederick County Detention Center for an immigration check as part of the booking process. Defendant Jenkins' contention that the 287(g) program is not discriminatory because

every arrestee is questioned at booking ignores the discriminatory behavior of the FCSO when making an arrest, *e.g.*, who they arrest and for what criminal violation.

16.     Defendant Jenkins also entered into an IGSA that allows him to profit from federal immigration detention.  The agreement allows Defendant Jenkins to house immigrant detainees at the Frederick County Detention Center for ICE, and is reimbursed for the costs associated with their detention at a rate of $83.00 per day per detainee.  Upon information and belief, the costs incurred from housing an immigration detainee in the Frederick County Adult Detention Center are less than the amount paid by the federal government as reimbursement for housing immigration detainees.  Defendant Jenkins also receives money through the SCAAP program, a federally-funded program that units of local government may apply for if they incarcerate "undocumented criminal aliens," or if they believe, in good faith, that they incarcerate "undocumented criminal aliens."  Frederick County was awarded over $50,000.00 in 2017 for their incarceration of undocumented immigrants.

17.     Many community members do not feel safe reporting crimes they have experienced in Frederick County to the police and many individuals victimized by the actions of the Defendants, including members of the RISE Coalition, do not feel safe making formal complaints against Defendant Jenkins and his deputies due to fear of retaliation.

18.     Plaintiffs aver that the Defendants in this action knowingly engage in a policy and practice of racial profiling, including unlawful seizures and detentions under pretenses of traffic and other minor offenses, unconstitutionally prolonging detentions without probable cause, and unjustified arrests so the FCSO may process immigrants through the 287(g) program and detain them for immigration violations.

**The Discriminatory Seizure and Prolonged Detention of Ms. Medrano**

19.     Ms. Medrano is one of many individuals victimized by the actions of the Defendants.

20.     She is a longtime Latina resident of Frederick County, and works for a home cleaning service.  She frequently leaves her house to drive to various homes to clean as part of her job, and also drives to visit her family, including her children and grandchildren, who also live in Frederick County.

21.     On July 7, 2018, Ms. Medrano was stopped by a Frederick County Sheriff's deputy and was subjected to a prolonged detention for no other reasons than her race and suspected immigration status.

22.     Around 7:00 PM, Ms. Medrano left her house near U.S. Route 15 with her daughter and two infant grandchildren in her Honda Odyssey to go to a friend's house.

23.     While Ms. Medrano was driving, it was still light outside, but she had her headlights turned on for safety.

24.     The traffic was light in the area where Ms. Medrano was driving that evening.

25.     Soon after merging onto U.S. Route 15, Ms. Medrano noticed that a law enforcement vehicle was following her.

26.     Ms. Medrano was not engaged in any unlawful or suspicious activity, nor was she engaged in activity that reasonably could have been perceived as unlawful.

27.     The police vehicle followed Ms. Medrano for some time as she drove straight on Route 15, then the lights and siren were turned on.

28.     After she saw the flashing lights behind her, Ms. Medrano pulled over but left her car engine running.  According to the police report, call logs, and traffic citation, the stop was initiated at 19:54, or 7:54PM.

29.     After Ms. Medrano pulled over, a uniformed deputy—upon information and belief, Defendant Mothershead—exited the law enforcement vehicle and approached Ms. Medrano's driver's side window.

30.     The deputy was dressed in a brown uniform and was armed.

31.     The deputy spoke to Ms. Medrano in English, but she could not understand him well because Spanish is her native language.

32.     Ms. Medrano does not recall the deputy ever identifying himself or explaining why he had stopped her.  Instead, he asked for Ms. Medrano's license and registration.

33.     Ms. Medrano gave the deputy her Maryland-issued driver's license and car registration.  Ms. Medrano also asked for a Spanish-speaking deputy.

34.     Defendant Mothershead took Ms. Medrano's license and registration and returned to his vehicle.  Ms. Medrano fearfully waited in her Honda Odyssey with her daughter and grandchildren.

35.     After Ms. Medrano had waited for approximately ten minutes, a different deputy— upon information and belief, Deputy Barrera—arrived in a separate law enforcement vehicle and approached Ms. Medrano's driver side window.

36.     The newly arrived deputy spoke Spanish and asked if Ms. Medrano knew why she had been pulled over.  Ms. Medrano responded by saying that she did not know.  The deputy told Ms. Medrano that her car had a burnt out taillight, but he did not identify a particular taillight. Instead, he asked her where she was from.

37.     Ms. Medrano answered Defendant Barrera, telling him that she had lived in Frederick for more than 13 years.

38.     Barrera asked Ms. Medrano if she was a resident or citizen.  He told Ms. Medrano that she had an immigration problem and told her to turn off the engine of her vehicle because they were going to be there for a while, so that immigration officials could come get Ms. Medrano.

39.     Defendant Barrera also asked for the identity of the front seat passenger in the car— Ms. Medrano's daughter.

40.     Ms. Medrano's daughter gave the deputy her identification, and Ms. Medrano complied with Barrera's direction by turning off the engine of her car.  Then she waited, terrified that this traffic stop would mark the moment when she would be taken away from her family, and be removed from the United States.

41.     Radio call logs recording Ms. Medrano's unlawful stop and detention indicate that while Ms. Medrano and her family nervously waited in their car, Defendant Mothershead made several calls to various individuals, including the 911 dispatcher, an agent from ICE, and a supervising officer at the FCSO.

42.     Defendant Mothershead first called the 911 dispatcher, who Defendant Mothershead claims told him that Ms. Medrano was "wanted through ICE." Defendant Mothershead then called ICE Officer Adam Tierney, who advised that ICE would not be responding at that time.  Nevertheless, Mothershead continued to detain Ms. Medrano.

43.     Mothershead then conferred for five minutes over the telephone with a supervising officer, Sergeant McFarland, about the traffic stop.

44.     Throughout this period, Ms. Medrano could not leave or terminate the encounter because the deputies had possession of her driver's license.

45.     After she had been detained by Defendants for nearly an hour, Defendant Barrera returned to Ms. Medrano's driver side window and handed her a written warning regarding her

alleged taillight issue, and her driver's license.  He did not explain the written warning.  Instead, he said that immigration officials were not answering, and he told Ms. Medrano that she should get a lawyer because there was a deportation order for her.

46.     Defendants Barrera and Mothershead then returned to their vehicles, and Ms. Medrano was allowed to leave.

47.     The traffic violation warning was written four minutes after the stop began, at 19:58 (7:58 PM), but Ms. Medrano was not free to leave until at least 20:48 (8:48 PM), the time indicated on the police report.

48.     The written warning issued to Ms. Medrano was issued by B. Mothershead, a deputy of the Frederick County Sheriff's Office, citing her for an alleged nonfunctioning taillight.

49.     Later that night, Ms. Medrano and her daughter checked the taillights on Ms. Medrano's Honda Odyssey.  Both taillights were functioning normally.

50.     Prior to July 7, 2018, Ms. Medrano had never been pulled over for a traffic violation, including any infraction related to a taillight violation.

51.     Since Ms. Medrano was pulled over on July 7, 2018, Ms. Medrano has continued to drive her Honda Odyssey regularly.  She has experienced no problems with her taillights, has not replaced any taillights, and she has not been pulled over for any issue with her taillights.

52.     Ms. Medrano continues to drive in Frederick County, and a removal order for Ms. Medrano is accessible to the FCSO deputies through various national databases.  Ms. Medrano is still at risk of the same or similar conduct by Defendants, and lives in fear of being pulled over again for no justifiable reason.

53.     Defendants' unlawful detention of Ms. Medrano caused and continues to cause her to suffer fear, humiliation, emotional distress, anxiety, stigma, and embarrassment.

54.     Ms. Medrano continues to fear that she, her family, and/or her acquaintances will be arbitrarily and unlawfully detained by FCSO deputies. As a result, she does not feel comfortable calling any law enforcement agency, including the FCSO, for any reason because she believes they would question her about her immigration status like her experience with Defendants Mothershead and Barrera.

**A Pattern and Practice of Targeting Immigrants of Color**

55.     The discriminatory behavior that Ms. Medrano experienced is not an isolated event. There are other members of the Frederick community, including other members of the RISE Coalition, who have been targeted and interrogated about their immigration status during Defendant Jenkins' tenure as Frederick County Sheriff.

56.     Roxana Orellana Santos was detained by FCSO deputies on October 7, 2008 while she was eating her lunch outside during a work break.  Two FCSO deputies, who were untrained and unauthorized to perform immigration functions under the 287(g) program, stopped their car and detained her without reasonable suspicion or probable cause while they investigated her immigration status. They arrested Ms. Orellana Santos, placed her in handcuffs without charging her with any violation of local, state, or federal law and illegally held her in jail.  This Court and the U.S. Court of Appeals for the Fourth Circuit Court have found the FCSO's behavior unconstitutional, and assigned liability to Frederick County, based on policies implemented and adhered to by Sheriff Jenkins. *Santos v. Frederick County Board of Commissioners*, 725 F.3d 451 (4th Cir. 2013), *Santos v. Frederick County Board of Commissioners*, 346 F. Supp. 3d 785, 792-93 (D. Md. Sept. 27, 2018).  Since her illegal arrest, Ms. Orellana Santos has been having regular ICE check-ins on an order of supervision, and on January 8, 2019 was detained unexpectedly at a routine check-in, and imprisoned for nearly four weeks before being released on February 4, 2019.

Because of the actions of the FCSO on October 7, 2008, Ms. Orellana Santos' experience has left her completely traumatized, heartbreakingly evincing signs of severe depression.

57.     Since the start of Defendant Jenkins' tenure as Sheriff, he has been embroiled in litigation over his deputies' meddling in immigration enforcement, and profiling immigrants in the Frederick community, yet he continues to push for U.S. immigration law enforcement by local officials in Frederick County.

58.     Mr. A. G. is another individual who is a victim of the FCSO's discriminatory behavior.  He and his wife are members of the RISE Coalition and seek justice against the FCSO for the racial profiling that A.G. suffers at the hands of the FCSO.  He is a Latino man who lives in Frederick County and works in the county as well.  He is a U.S. citizen and is regularly pulled over based upon false or suspicious allegations of broken tail lights and other minor traffic violations.  Whenever he is pulled over by the FCSO, the deputy aggressively asks him about his immigration status and whether he was born in the U.S., whether he's "legal," and most recently, about why he speaks such good English.  Over the last two years, he has been stopped at least seven times, and questioned about his immigration status at least three of those times, as the driver of a car, the passenger of a car, or simply as a pedestrian.

59.     In addition to individual instances of harassment and discriminatory policing, a practicing immigration lawyer, Mr. Calvin Fisher, who is a member of the RISE Coalition, recounted at the annual 287(g) Steering Committee meeting[1] on June 13, 2018 a conversation he overheard at the County jail between two sheriff's deputies.  The deputies were discussing why a particular individual was arrested for an open container offense, instead of simply receiving a

---

[1] The Frederick County Sheriff and members of the ICE Field Office in Baltimore conduct an annual presentation of the previous year's results in the 287(g) program open to the public.

citation, and one explained that if they arrested the individual and brought him to the jail, they could process him through the 287(g) program and detain and deport him on an immigration offense.

60.     At the time of Ms. Medrano's detention, FCSO patrol operations policy, promulgated and adhered to by Defendant Jenkins, as Sheriff for Frederick County, permitted or required deputies to arrest individuals when deputies were "aware of an outstanding arrest warrant," without any distinction between different types of warrants or limitations upon use of federal civil immigration warrants in this manner, resulting in detentions and arrests simply for the purpose of immigration enforcement.

61.     Upon information and belief, Defendant Jenkins has, at best, completely ignored and disregarded complaints of selective enforcement against immigrants of color, despite the active litigation against him for similar behavior committed by FCSO deputies in the arrest and persecution of Roxana Orellana Santos.  Indeed, Plaintiffs aver that Defendant Jenkins deliberately directs, encourages, aids, abets, and/or permits deputies of the FCSO to selectively target for investigation individuals whom deputies perceive, based upon their race, to be immigrants to the United States, in a manner inconsistent with the U.S. Constitution.

62.     Upon information and belief, FCSO deputies have engaged in a pattern and practice, custom, and/or policy of seizing and detaining individuals for federal immigration violations or based on federal immigration warrants, without direction or supervision from federal authorities.

63.     Upon information and belief, Defendants in this action knowingly engage in a policy and practice of racially profiling individuals for immigration enforcement purposes by pretextually stopping and detaining individuals in order to process them through the 287(g)

program. Since the Frederick 287(g) program does not authorize street immigration enforcement, Defendants detain and arrest Latinx immigrants so they may be processed through the 287(g) program at the County jail for deportation.

64.     Studies of policing in Frederick County show a pattern and practice of discriminatory policing against the immigrant community under Defendant Jenkins' leadership. A 2017 study of the FCSO's 287(g) program by Professor Michael Coon at the University of Tampa, published in the Journal on Migration and Human Security, evaluated the effects of implementation of the 287(g) program in Frederick County on the behavior of FCSO deputies and arrests of Latinx people.  Coon's study concluded that the program's adoption in 2008 led to an increased number of arrests of Latinx individuals by the FCSO—11 to 13 more Latinx individuals than those of other races per month—than would have occurred in its absence, while arrests of white and Black people by the FCSO fell significantly following implementation of the 287(g) program.  The data indicates that law enforcement by the FCSO has focused more on the Latinx community since its undertaking of the 287(g) program.

65.     Various other studies disprove Defendant Jenkins' claims that the program benefits public safety, including studies conducted by the Migration Policy Institute and the Cato Institute.[2]

66.     Upon information and belief, Defendant Jenkins also fails to train and supervise FCSO deputies to ensure individuals are not seized or arrested based solely on civil immigration

---

[2] Randy Capps, *Delegation and Divergence: A Study of 287(g) State and Local Immigration Enforcement*, MIGRATION POLICY INSTITUTE, Jan. 2011; Andrew Forrester, *Do Immigration Enforcement Programs Reduce Crime? Evidence from the 287(g) Program in North Carolina*, CATO INSTITUTE, Apr. 11, 2018, https://object.cato.org/sites/cato.org/files/pubs/pdf/working-paper-52-updated.pdf (concluding there is no causal relationship between the existence of a 287(g) program and a benefit to public safety in the jurisdictions studied in North Carolina. In fact, the study found a causal relationship between the existence of the 287(g) program and assaults on police officers, suggesting that the existence of the immigration program was in fact detrimental to the public safety of the county).

violations or civil immigration warrants that may exist in law enforcement databases, such as the National Crime Information Center database.

67.     Defendants' policies and practices create an atmosphere of fear and intimidation within the immigrant community that necessitate the existence of groups like the RISE Coalition. Defendants' illegal actions, and Defendant Jenkins' anti-immigrant rhetoric, isolate and traumatize the immigrant community in Frederick County, eviscerating the trust that immigrants need to rely on law enforcement for their protection.

**Defendant Jenkins' Outspoken Animus Towards Immigrants**

68.     Defendant Jenkins engages in immigration enforcement in Frederick County on the basis of racial animus toward the immigrant community. He has made anti-immigrant statements at public events and on news media, he has aligned himself with other anti-immigrant hard-liners who have also been outspoken in their racial animus towards immigrants, and he has advocated for anti-immigrant legislation at every level of government: the Frederick County Council (and the former Board of County Commissioners), the Maryland State Legislature, and the U.S. Congress.

69.     Defendant Jenkins was named by Fox News as the "Second 'Toughest' Sheriff on Immigration" after former Arizona Sheriff Joe Arpaio, who was convicted of violating a federal court order for illegally profiling and detaining Latinx immigrants.[3]

70.     In 2007, during his campaign for Frederick Sheriff, Jenkins stated that undocumented "aliens" were moving to Frederick County from Northern Virginia, but that he planned to "shoot them right back."  He stated that "the single biggest threat to our country is the

---

[3] *America's Top 10 'Toughest' Immigration Sheriffs*, FOX NEWS, https://www.foxnews.com/us/americas-top-10-toughest-immigration-sheriffs; Daniel Moattar, *'The Next Joe Arpaio': the Maryland sheriff praised by Fox and Trump*, THE GUARDIAN, Oct. 22, 2018, https://www.theguardian.com/us-news/2018/oct/22/frederick-county-chuck-jenkins-donald-trump-immigration-ice.

immigration problem.  We cannot continue to absorb this population or we will end up in collapse like a Third World Country."

71.   Defendant Jenkins participated in a 2014 trip to the Mexican border funded by a recognized hate group, and a 2018 anti-immigrant rally where he spoke beside white supremacist Congressman Steve King and former Arizona Sheriff Joe Arpaio.

72.   In multiple interviews, he has also called people *suspected* of gang activity "savage" and  "terrorists" and promoted "jail[ing] them at Guantanamo."[4]  The news coverage where Defendant Jenkins expressed these racist dog-whistles included images of Latinx individuals being arrested to ensure the imagery of anti-immigrant policing is associated with policing Latinx communities.  Defendant Jenkins has said that unaccompanied refugee children "aren't all the innocent children they're portrayed to be."  He calls recipients of the Deferred Action on Childhood Arrivals ("DACA") program "hardcore gangbangers," and claims that we need to "round these people up and place them in Guantanamo until we can deport 'em."[5]

73.   Defendant Jenkins consistently describes people seeking refuge in the United States through the southern border as an "invasion" of America, calls for closing the border, and putting more immigrants in detention regardless of any criminal conduct.[6]

---

[4] The Daily Ledger, *Frederick County Sheriff, Chuck Jenkins, on MS-13*, YOUTUBE (Nov. 29, 2017), https://www.youtube.com/watch?v=y7EEMyQJpcc;
[5] Maureen Dowling, *Sheriff Jenkins: controlling the invasion*, YOUTUBE (Jul. 16, 2015), https://www.youtube.com/watch?v=MWAz9_leOVY;  One Frederick Many Voices, *Sheriff Charles (Chuck) Jenkins, Frederick, Maryland 287g: 'They Come to America'*, YOUTUBE (Aug. 24, 2012), https://www.youtube.com/watch?v=4XPDpKyKqsY; The Daily Ledger, *Frederick County Sheriff, Chuck Jenkins, on MS-13*, YOUTUBE (Nov. 29, 2017), https://www.youtube.com/watch?v=y7EEMyQJpcc; WBAL, *Brian Nehman Talks to Sheriff Chuck Jenkins about Immigration*, YOUTUBE (Feb. 14, 2018), https://www.youtube.com/watch?v=RuvClD6O5z8.
[6] Frederick County, Maryland Candidates in Action -2014, *Sheriff Charles A. (Chuck) Jenkins Calling in from Texas July 16, 2014 m4a*, YOUTUBE (Jul. 16, 2014), https://www.youtube.com/watch?v=SzcdGNk2nNA; C-Span, *Angel Families on Illegal*

74.     Defendant Jenkins has dismissed accounts of FCSO misconduct at public events related to the 287(g) program, even when victims of police misconduct come forward and tell their stories.[7]  He has falsely stated, "we haven't had a racial profiling complaint either through this program or otherwise.  I don't have one documented report of any profiling, any discrimination, any officer misconduct, not one formal complaint," ignoring Roxana Orellana Santos' lawsuit against him and his office, scholarly studies, and testimony provided by RISE Coalition members at public meetings.

75.     In every police-involved shooting, and in every police misconduct allegation made against the FCSO, Defendant Jenkins has shirked responsibility, denied wrongdoing, and blamed the victims for what happened to them.  This includes the killing of Abraham Arellano, a Latino man living in Thurmont, the unlawful arrest and detention of Roxana Orellana Santos, and the killing of Robert Ethan Saylor, a disabled man who was asphyxiated by two FCSO deputies.  Even after a $1.9 million settlement over the killing of Mr. Saylor, Defendant Jenkins still falsely claims it was justified and the officers committed no wrongdoing.[8]  Defendant Jenkins does not hold his officers accountable for their wrongdoing, and does not protect the public from the FCSO's illegal behavior.

76.     Defendant Jenkins has also given various false narratives of what happened in Roxana Orellana Santos' case.  First he lied, claiming that she hid when his deputies approached her in their police car, then he wrongly claimed that she ran, trying to justify what followed on that

_Immigration_ (Sept. 7, 2018), https://www.c-span.org/video/?451186-1/angel-families-illegal-immigration; Maureen Dowling, _Sheriff Jenkins: controlling the invasion_, YOUTUBE (Jul. 16, 2015), https://www.youtube.com/watch?v=MWAz9_leOVY.
[7] At the 2018 June 287(g) Steering Committee Meeting, various RISE members testified to discriminatory actions by police in Frederick County.
[8] Frederick News Post, _Beyond the Ballot – Frederick County Sheriff Chuck Jenkins_, YOUTUBE (Dec. 6, 2018), https://www.youtube.com/watch?v=pOAq3zy10hg.

basis.[9]   Notwithstanding federal court rulings to the contrary, Jenkins still maintains that the deputies in that case did nothing wrong.[10]   Outrageously, he has even gone so far as to say that this Court's September 2018 summary judgment decision, in which this Court determined that Frederick County was liable for the unconstitutional seizure and arrest of Ms. Orellana Santos (because of Defendant Jenkins' policies and practices), was based on Judge Blake's emotions or political beliefs, rather than facts or correct application of the law.[11]   In these ways, Defendant Jenkins refuses to take responsibility for the actions committed by his Office and will not willingly change FCSO behavior.

77.     Consistent with his evident racial animus, Defendant Jenkins also advocates for xenophobic, anti-immigrant legislation at the county, state and federal levels.  At the county level, in 2015 when the County Council ended the "English-only" ordinance that had existed in Frederick County since 2012, Defendant Jenkins stated that "the U.S. is about one language, we are one culture."[12]   English-only advocacy has historically been a movement aligned with racist, anti-immigrant, and white nationalist ideologies that center discrimination against marginalized communities, and use rhetorical dog-whistles like "one language" and "one culture" to advocate for the destruction of other cultures.[13]

---

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *'English-only' and the fight for Frederick's character*, BALTIMORE SUN, Aug. 7, 2015, https://www.baltimoresun.com/news/opinion/bs-ed-frederick-english-20150807-story.html.

[13] The Poverty & Race Research Action Council discusses the historical roots of the English-only movement as associated with colonial efforts to subjugate Native Americans and African Americans, and specifically as a movement that has been connected to anti-immigrant white nationalist efforts. John Tanton, the founder of the Federation for American Immigration Reform (FAIR) and ProEnglish, are organizations recognized as hate groups that specifically advocate for anti-immigrant policy and Tanton has deliberately connected the two movements to advocate for appalling racial campaigns such as racial eugenics.
https://www.prrac.org/newsletters/mayjun2005.pdf;

78.     Defendant Jenkins has likewise advocated in the Maryland State legislature against pro-immigrant bills like the Maryland Trust Act in 2014.  In Defendant Jenkins' written testimony, he cited as an example of the "positive" partnership between immigration and local law enforcement Arizona's "Show me your papers" law, Senate Bill 1070 – significantly invalidated by the U.S. Supreme Court as unconstitutional – that enabled former Sheriff Joe Arpaio to conduct discriminatory racial policing that terrorized the Latinx community in Maricopa County.  He also discounted the chilling effects that programs such as the 287(g) program have on individuals like Ms. Medrano, who are afraid to seek help from police out of fear of what might happen if they do.[14]

79.     Defendant Jenkins also testified in support of anti-immigrant bills such as a 2008 bill, SB 621, outlawing the issuance of drivers licenses to those who could not verify their U.S. citizenship, and a 2017 bill, SB 830, that would have required cooperation between local law enforcement and ICE, including detaining people for 48 hours beyond their scheduled release, a law that would have been unconstitutional under the U.S. Court of Appeals for the Fourth Circuit's decision in *Santos v. Frederick County Board of Commissioners*, 725 F.3d 451 (4th Cir. 2013).  In Jenkins' 2008 testimony, he equated "illegal aliens" with terrorists and used animalistic language like drivers' licenses being "breeder documents most prized by both terrorists and illegal aliens."[15] In 2017, in support of requiring cooperation with ICE, Defendant Jenkins wrote, "by not passing this bill, every member of this legislature is morally complicit in every crime that is committed

---

https://www.splcenter.org/hatewatch/2015/08/27/anti-immigrant-group-proenglish-fails-english-only-effort-maryland.

[14] *Maryland Law Enforcement Trust Act: Hearing on H.B. 29 Before Judiciary Committee,* 2014 Leg. (Md. 2014) (written statement of Sheriff Charles Jenkins).

[15] *Vehicle Laws – Driver's Licenses – Lawful Presence in the United States*: *Hearing on S.B. 621 Before Judicial Proceedings Committee*, 2008 Leg. (Md. 2008) (written statement of Sheriff Charles Jenkins).

against a Marylander by a criminal alien that [sic] released from a jail or prison back onto our streets. This [sic] aiding and abetting criminal activity."[16]

80.    In 2009, Defendant Jenkins testified before the U.S. House Committee on Homeland Security that one of his reasons for seeking participation in the 287(g) program was due to "[t]he enormous increase in crime throughout the United States, to include this region, which can be tied directly to the unchecked flow of illegal immigrants through our southern borders with Mexico."

81.    In 2016, Defendant Jenkins testified in the U.S. House Judiciary Committee that the FCSO, through its participation in the 287(g) program, had "very effectively built a wall around Frederick County," and called for the passage of a Congressional bill[17] that would have allowed him and sheriffs like former Sheriff Joe Arpaio to carry out their anti-immigrant extremism by criminalizing the immigrant population under local criminal and civil law and allowing deputies to arrest and prosecute immigrants suspected even of civil immigration violations.

82.    Defendant Jenkins consistently uses racist dog whistles in his advocacy against immigrants.  He claims that migrants seeking refuge in the United States are part of an "invasion" that cannot be allowed to continue, he calls immigrants "illegals"; he calls DACA recipients criminals; he spoke at Tea Party and Take America Back rallies where there were calls to "storm the White House" while President Obama was in office; and he openly claims the rights of "Americans" should trump the rights of immigrants.[18]

---

[16] *Correctional Facilities – Individual Subject to Immigration Detainer – Homeland Security Notification: Hearing on S.B. 830 Before Judicial Proceedings Committee,* 2017 Leg. (Md. 2017) (written statement of Sheriff Charles Jenkins).

[17] Former House Judiciary Committee Chair Trey Gowdy's bill, H.R. 1148, The "Michael Davis Jr. and Danny Oliver in Honor of State and Local Law Enforcement Act."

[18] C-Span, *Angel Families on Illegal Immigration* (Sept. 7, 2018), https://www.c-span.org/video/?451186-1/angel-families-illegal-immigration.

83.     Defendant Jenkins has consistently fought against any effort to provide protections for immigrants in Maryland at least since taking office as Sheriff of Frederick County. His animus toward the immigrant community has manifested into policies and practices that target the immigrant community, isolating and marginalizing them as second class in violation of their rights guaranteed by the U.S. Constitution.

84.     Ms. Medrano and others in the RISE Coalition have expressed the real chilling effect Defendant Jenkins' words have inflicted upon the Latinx community, and their complete lack of trust in the public safety commitment of the FCSO in Latinx and other immigrant communities because of the race-based rhetoric of the Sheriff.

## FIRST CAUSE OF ACTION

### UNLAWFUL SEIZURE AND DETENTION
**Fourth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C §1983**
**(All Plaintiffs against Defendants Jenkins, Mothershead, and Barrera in their Personal and Official Capacities and Frederick County)**

85.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

86.     Defendants, acting under color of law, have subjected plaintiffs to detentions without probable cause or reasonable suspicion to believe that any crime has been committed, in violation of the Fourth Amendment guarantee against unreasonable searches and seizures, giving rise to Plaintiffs' claims pursuant to the Fourteenth Amendment, and 42 U.S.C. § 1983.

87.     Specifically, Defendants Mothershead and Barrera seized and/or detained Ms. Medrano for a prolonged period of time based on nothing more than her actual or perceived race, ethnicity, and/or national origin, without reasonable, individualized, articulable suspicion that Ms. Medrano was involved in unlawful activity.

88.     Other members of the RISE Coalition have been subjected to seizure and/or detention for prolonged periods of time based on nothing more than their actual or perceived race, ethnicity, and/or national origin, without reasonable articulable suspicion of unlawful activity in violation of the Fourth and Fourteenth Amendments.

89.     Defendant Jenkins was personally involved in and proximately caused the aforementioned violations of Plaintiff Medrano's rights by knowingly and intentionally engaging in a policy, practice, and/or custom in which local law enforcement officials participate in the unconstitutional conduct described in the preceding paragraphs, including detaining and arresting individuals on the basis of their immigration status as a pretext to process them through the 287(g) program. As Sheriff, Defendant Jenkins is also responsible for implementing and administering the policies, practices, and/or customs of the FCSO and failing to properly train FCSO officers about their legal responsibilities.

90.     Defendant Jenkins' anti-immigrant rhetoric and his active endorsement of other anti-immigrant officials indicates his intentionally discriminatory purpose in using ethnicity and nationality to arrest and detain undocumented immigrants.

91.     As a proximate and foreseeable result of the Defendants' actions, Ms. Medrano, as an individual and as a member of the RISE Coalition, has suffered, is suffering, and will continue to suffer damages, including but not limited to violation of her constitutional rights, loss of liberty, emotional distress, anxiety, stigma, and embarrassment. Other individuals and members of the RISE Coalition have similar fears based on their own, similar experiences in Frederick County.

## SECOND CAUSE OF ACTION

### VIOLATION OF EQUAL PROTECTION
**Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. §1983
(Defendants Jenkins, Mothershead, and Barrera in their Personal and Official Capacities
and Frederick County)**

24

92.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

93.     Defendants have, under color of law, implemented a pattern and practice of intentional race discrimination by stopping and detaining Latinx individuals on the basis of their actual or perceived race and/or national origin.  In so doing, Defendants have caused Plaintiff Medrano and other RISE Coalition members to suffer deprivation of their fundamental rights to liberty and to be free from unlawful searches, detentions, and seizures, on account of their race and/or national origin.

94.     In stopping and detaining Ms. Medrano based upon a false allegation about her taillight, Defendants Mothershead and Barrera were acting in accordance with the policy, and/or the pattern and practice of discrimination on the basis of actual or perceived race, ethnicity, and/or national origin that had been established and tolerated within the FCSO.

95.     Defendant Jenkins condoned the discriminatory practices through his disparaging comments about immigrants from Latinx countries, his statements about the need for local immigration enforcement, his participation in events and activities funded and attended by hate groups and other vocally anti-immigrant individuals, and through the discriminatory enforcement of the 287(g) program against Latinx individuals.

96.     By relying on actual or perceived race or ethnicity as a motivating factor in deciding to seize or detain Ms. Medrano, Defendants Mothershead and Barrera engaged in racially discriminatory policing by detaining and seizing Ms. Medrano on the basis of her inability to speak fluent English and her perceived race without legal justification, thereby violating Ms. Medrano's Fourteenth Amendment right to Equal Protection under the law.

97.     As a proximate and foreseeable result of the Defendants' actions, Plaintiffs have suffered, are suffering, and will continue to suffer damages, including but not limited to violation of their constitutional rights, loss of liberty, emotional distress, anxiety, stigma, and embarrassment.

98.     As a proximate and foreseeable result of the Defendants' actions, Plaintiffs fear that they will be stopped, detained, and treated unfairly and in a discriminatory manner in the future by FCSO law enforcement officers. Fear of unfair and discriminatory treatment also impedes Plaintiffs' ability to travel and move within Frederick County unhindered and free from harassment by Defendants.

## THIRD CAUSE OF ACTION

**RACE DISCRIMINATION IN FEDERALLY-FUNDED PROGRAMMING**
**Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d**
**(Defendants Frederick County and Frederick County Sheriff's Office)**

99.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

100.    Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

101.    Federal regulations implementing Title VI further provide that no program receiving financial assistance through the U. S. Department of Justice shall "utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially

impairing accomplishment of the objectives of the program as respects individuals of a particular race, color, or national origin." 28 C.F.R. § 42.104 (b)(2).

102.    Defendants receive federal financial assistance and are subject to Title VI requirements. The FCSO and Frederick County receive federal financial assistance and funding from the U.S. government as part of their participation in the IGSA, 287(g) program, and SCAAP.

103.    Defendants' discriminatory implementation of policies and practices violate Title VI.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Declare that the actions of Defendants pertaining to the seizure and prolonged detention of Ms. Medrano and other similarly situated members of the RISE Coalition violated the Fourth and Fourteenth Amendments of the United States Constitution.

B.    Declare that the policy of authorizing FCSO deputies without direct federal direction or supervision to seize and detain individuals with immigration warrants in the NCIC database unconstitutional on its face and as applied, and that it resulted in the unjustified detention of Ms. Medrano in violation of the Fourth and Fourteenth Amendments of the United States Constitution.

C.    Permanently enjoin Defendants, their deputies, officers, agents, servants, employees, and those persons in active concert or participation with them who receive actual notice of the injunction, from permitting or engaging in any form of immigration enforcement, including the seizure and/or detention of individuals based on civil immigration violations or warrants, absent federal direction and supervision.

D.      Alternatively, permanently enjoin Defendant Jenkins, his deputies, officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction, from promulgating, enforcing, or adhering to any policy, practice, or custom that permits or requires seizures or detentions of individuals based solely on civil immigration violations or warrants, in the absence of federal direction or supervision.

E.      Award plaintiff Ms. Medrano compensatory and consequential damages against Defendants in an amount to be determined by the jury.

F.      Award Ms. Medrano punitive damages against Defendant Jenkins in his personal capacity.

G.      Award Plaintiffs their costs and reasonable attorneys' fees in this action.

H.      Grant such other relief as the Court deems just and proper.

## I. **<u>DEMAND FOR JURY TRIAL</u>**

J.      Plaintiffs hereby demand a trial by jury.

Dated: July 11, 2019

        /s/

Nicholas T. Steiner, Esq. (Bar No. 19670)
Deborah A. Jeon, Esq. (Bar No. 06905)
**AMERICAN CIVIL LIBERTIES UNION OF
MARYLAND FOUNDATION**
3600 Clipper Mill Road, Suite 350
Baltimore, MD 21211
Telephone: (410) 889-8550
steiner@aclu-md.org
jeon@aclu-md.org


John C. Hayes, Jr. (Bar No. 01936)
Brian J. Whittaker (Bar. No. 04414)
**NIXON PEABODY LLP**
799 9th Street, N.W., Suite 500
Washington D.C.  20004
(202) 585-8000 (phone)
(866) 814-2042 (facsimile)
jhayes@nixonpeabody.com
bwhittaker@nixonpeabody.com

*Counsel for Plaintiffs*